**Joseph and Holly H. COORS**

v.

**The UNITED STATES.**

No. 73-75.

United States Court of Claims.

Feb. 22, 1978.

Gene W. Reardon, Denver, Colo., atty. of record, for plaintiffs. Reardon, Reardon & Reardon, Denver, Colo., of counsel.

James L. Malone, III, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant. Theodore D. Peyser and Donald H. Olson, Washington, D. C., of counsel.

Before COWEN, Senior Judge, and NICHOLS and BENNETT, Judges.

## OPINION

### PER CURIAM:

This case comes before the court on defendant's exceptions to the recommended decision of Trial Judge Thomas J. Lydon, filed February 10, 1977, pursuant to Rule 134(h), having been submitted on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth *, it hereby affirms and adopts the decision as the basis for the judgment in this case. It is, therefore, concluded that plaintiffs are entitled to recover, including appropriate interest as provided by law, and judgment is entered

to that effect, with the amount of recovery to be determined pursuant to Rule 131(c).

## OPINION OF TRIAL JUDGE

LYDON, Trial Judge:

In joint federal income tax returns, plaintiffs, husband and wife, claimed deductions in the amounts of $3,058 for the calendar year 1967 and $3,301 for the calendar year 1968 as interest payments made to the Equitable Life Insurance Society Of The United States (Equitable) during those years. Equitable had insured the life of plaintiff Joseph Coors (J. Coors) by means of four life insurance policies it issued during the period 1955–1960. Plaintiff Holly H. Coors (H. Coors) was the registered owner of these four policies and the family of J. Coors was the ultimate beneficiary of said policies. The Internal Revenue Service disallowed these claimed interest deductions on the ground said deductions did not represent interest paid on a bona fide indebtedness. As a result, tax deficiencies were assessed against plaintiffs for those years. Plaintiffs paid those tax deficiencies and thereafter filed timely claims for refund of the amounts so paid, plus interest. Plaintiffs' refund claims have not been acted on by the Commissioner of Internal Revenue. See 26 U.S.C. § 6532(a)(1). Since all procedural requirements have been met, plaintiffs' petition in this court for refund of federal income taxes, plus statutory interest, for calendar years 1967 and 1968, is timely and otherwise proper.

Plaintiffs maintain that the disputed payments to Equitable during 1967 and 1968 are properly deductible under section 163(a) of the Internal Revenue Code of 1954, since these payments constituted "interest paid * * * within the taxable year on indebtedness" (26 U.S.C. § 163(a) (1970)). Defendant contends that the loan transactions which generated the interest payments in question were such that an indebtedness, within the intendment of section 163(a), did

---

* Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report filed February 10, 1977, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

not exist in fact. Further, defendant argues that, on analysis, the claimed interest payments, in substance, represent the purchase of insurance protection during the years 1967 and 1968 and therefore should be considered "personal" and "family" expenses which are not deductible under section 262 of the Internal Revenue Code of 1954 (26 U.S.C. § 262). For reasons which follow, it is my opinion that the payments in question are allowable as deductions under section 163(a).

## I

In 1942, plaintiffs, married a year earlier, had their first child. In 1942 J. Coors began to purchase life insurance in order to provide protection and financial security for his family. J. Coors' first life insurance policy was a 20-Payment Life Policy with a face amount of $10,000 and annual premiums of $313.00. As his family grew, by 1954 plaintiffs had four children, J. Coors increased his life insurance coverage. In 1947 and 1948, J. Coors purchased two Ordinary Life Policies with face amounts of $30,000 (annual premiums of $712.00) and $10,000 (annual premiums of $261.00), respectively. In 1954, J. Coors purchased another Ordinary Life Policy with a face amount of $50,000 and annual premiums of $1,352.00.

As to the above four policies, J. Coors was the insured and owner of the policies, and H. Coors, his wife, was the beneficiary. Each policy was issued by Equitable, a mutual life insurance company, and each policy was arranged through Joseph Tooker (Tooker), an independent insurance agent, who was a friend, an ex-classmate, and brother-in-law of J. Coors. At all times material herein, Tooker served as the insurance adviser and agent for plaintiffs. Each of these policies contained a standard "Loans" provision which offered the insured the opportunity to borrow from Equitable on the security of and in accordance

with the terms of the policy. J. Coors never borrowed from Equitable on the security of these four policies. These four policies are not directly involved in this litigation. However, they do serve to establish that plaintiffs, at an early stage in their married life, embarked on a purposive program of providing family protection and financial security by means of insurance coverage on the life of J. Coors.

By 1955, plaintiffs had five children. This situation induced J. Coors to purchase two more life insurance policies from Equitable in order to provide additional protection and financial security for his family, including the education of his five children. The policy purchased in 1955 had a face amount of $100,000, with annual premiums of $2,689. The policy purchased in 1959 had a face amount of $100,000, with annual premiums of $2,971. In 1960, the brother of J. Coors was kidnapped and murdered. This tragedy left the brother's widow with insufficient financial protection and security. It also convinced J. Coors he needed additional insurance coverage in order to protect and provide for his family's needs in case of his death. Accordingly, in 1960 he purchased two additional life insurance policies from Equitable. Each policy was in the face amount of $100,000, and each policy had annual premiums of $3,086. At this time J. Coors was 42 years of age.

The four life insurance policies purchased by J. Coors during the period 1955–1960 were Adjustable Whole Life Policies and were placed with Equitable through Tooker. Each of these policies was a typical, conventional, straight, ordinary life insurance policy offered by Equitable to the public at large.[1] The Adjustable Whole Life Policy was Equitable's most popular and largest selling life insurance plan. These four life insurance policies sowed the seeds for the instant litigation and are at issue herein.

1. The two 1960 policies contained option provisions (referred to as Plan B) which enabled the policy owner to utilize policy-generated dividends to purchase 1-year term insurance coverage equal to the stated loan and cash surrender value of each policy at the next policy anniversary date.

As to these four Adjustable Whole Life Policies, J. Coors was the insured. However, H. Coors was the registered owner of these policies. While H. Coors was initially the designated beneficiary of each policy, an amendment to each policy in 1962 changed this designation so as to make a family trust the designated beneficiary of each policy.

Each of the above four policies contained a "Loans" provision which enabled the owner of the policies to obtain "an advance from the Society of a sum not exceeding such loan value on proper assignment of this policy and on the sole security hereof * * *."[2] Advances (or loans) were to bear interest at the rate of 5 percent per annum. Further, it was provided that "[i]nterest will accrue from day to day and will become a part of the indebtedness to the Society against this policy as it accrues." The policy owner could repay any indebtedness to Equitable at any time during the lifetime of the insured. Finally, each "Loans" provision stated: "Extended term insurance shall be without the right to loans."

The annual premiums associated with each policy remained constant throughout the life of each policy. These premiums reflected standard rates charged by Equitable relative to life insurance policies it sold to the public. At no time during the life of each of the four policies in issue were the premiums prepaid, nor were the premiums ever discounted in any way.

Dividends on the four policies in issue were available annually to H. Coors as the owner of said policies. Each policy provided that these dividends, at the option of the policy owner, could, *inter alia,* be paid in cash or applied toward the payment of any premium due on the policy.

H. Coors never borrowed from Equitable against the security of any policy she owned prior to 1959. In January of 1959, plaintiffs were "somewhat strapped for money." With the premium of $2,689 due to be paid on her 1955 policy on January 23, 1959, Tooker suggested that plaintiffs borrow the sum of $2,689 from Equitable against the security of said policy in order to pay said premium. The loan and cash surrender value of the policy at the time was in excess of $6,000. After the loan on this policy was consummated, which loan was used to pay the premium due on the policy, the loan and cash surrender value of the policy was $3,582. There is no evidence in the record that the subject of the tax deductibility, and its resulting impact on plaintiffs' financial situation, of the interest payments to be made to Equitable relative to said borrowings was ever discussed between Tooker and plaintiffs. Further, there is no evidence that plaintiffs would not have borrowed from Equitable if they had known that interest payments on borrowings from Equitable would not be taxed deductible.

In 1960, H. Coors began to borrow on the security of the 1959 policy in order to assist her in the payment of the premiums due on that policy. In 1961, H. Coors began to borrow on the security of the two 1960 policies in order to assist her in the payment of the premiums due on those policies. The findings of fact detail these borrowing transactions and will not be repeated here. It is sufficient to state that from 1961 and thereafter H. Coors continued to borrow on the security of the four policies in issue, within the limitations of the loan and cash surrender values of said policies as allowed by Equitable. In general, the annual pre-

---

2. While Equitable, like most insurance companies, did not look with favor on policy owners borrowing on the security of their policies, it could not refuse to allow such borrowing under the laws of the State of New York to which it was subject. Equitable, however, protected itself by limiting, as standard practice, the amount of borrowing against each policy to 95 percent of the appropriate loan and cash surrender value of each policy. The record suggests that a good many policy owners borrow from Equitable on the security of their policies. Tooker testified he had some 50 to 60 clients who borrowed annually from Equitable on the security of their policies in order to pay, in whole or in part, the premiums due on their policies. The record also indicates that generally borrowing by policy owners from insurance companies increases when market interest rates are high because policy borrowing rates are lower.

miums due on the four policies, at times material herein, were paid by a combination of the application of the loans received on each policy annually, application, in whole or in part, of the dividends received on each policy annually, and cash payments.[3]

The procedures generally followed relative to the loans obtained by H. Coors from Equitable were as follows: Each year, Equitable sent H. Coors a premium due notice for each policy. This notice would state the amount of premium payment due, the amount of dividends payable to H. Coors and the status of the loan balance account (*i. e.,* the total amount previously borrowed from Equitable). Upon receipt of this notice, H. Coors would contact Tooker, who, in turn would contact Equitable to determine what the loan and cash surrender value of the policy was in order to determine what the borrowing limits on the policy would be. Tooker would thereafter consider the amount of borrowing available for application toward payment of the premium. He would also give due regard to the application toward said payment of dividends then payable to H. Coors on the policy. This analysis would indicate the amount, if any, of cash H. Coors would be required to pay in order that the total premium payment could be met. Tooker would obtain from Equitable a loan application form, labeled "Special Contract," and transmit the same to H. Coors for execution. H. Coors would execute the "Special Contract" and return it to Equitable, through Tooker, with the necessary cash payment which, together with the loan and dividend application, served to pay the premium due on the policy.

Each time a loan was sought from Equitable by a policy owner, a Special Contract had to be executed by the policy owner and Equitable. The provisions of the Special Contract, standardized in form and substance, used by Equitable had remained unchanged for some 25 to 30 years. The Standard Contract provided, *inter alia,* that "[t]he advance, with any interest due or accrued thereon, shall constitute an indebtedness to the Society [Equitable] against said policy," and that "[t]he advance with interest due or accrued may be repaid at any time during the lifetime of the insured * * *." The Standard Contract further provided that "[t]he Society may exercise all powers necessary, including the power to commute any amount payable in installments under said policy, to effect repayment of the indebtedness including interest due or accrued * * *." Under the Special Contract, the advance (loan) obligation was to be satisfied from the loan and cash surrender value of the policy if the policy were terminated or from death benefits payable if the insured died.

At times material herein, the loans obtained by H. Coors from Equitable never exceeded the loan and cash surrender values of the four policies in issue. Under the procedures followed by Equitable, there never would be any loans issued which would exceed these values. Accordingly, the loan obligations of H. Coors to Equitable were at all times secured by the cash reserve (cash surrender value) of each policy.[4] At no time did H. Coors prepay any interest obligations relative to loans obtained from Equitable. Finally, there is no dispute about the fact that the loans obtained by H. Coors from Equitable were applied toward payment of the premiums due on the four policies in issue.

In 1967 and 1968, H. Coors made interest payments of $3,158.86 and $3,127.49, respectively, to Equitable on loan obligations due Equitable.[5] As a result of borrowing

---

3. The record is less clear relative to the motivation behind H. Coors' borrowing in years subsequent to 1960. There is no evidence that plaintiffs' financial circumstances improved subsequent to 1960. An inference seems warranted that plaintiffs' financial circumstances continued to motivate the borrowings by H. Coors from Equitable in years subsequent to 1960, including the years 1967 and 1968.

4. Because of this fact, a personal obligation of H. Coors to repay these loans never would surface.

5. On their joint federal income tax returns, plaintiffs claimed deductions of $3,058 as interest payments for 1967 and $3,301 as interest payments for 1968. There is no explanation in the record as to the difference between the

against the cash surrender values of the four policies in issue in succeeding years, there was no significant build-up of cash surrender values relative to each policy as of 1967. The loan balance account maintained by Equitable represented the total amount of borrowing over the years by H. Coors from Equitable and represented the amount due Equitable from H. Coors. The amount in the loan balance account served to decrease the net death benefits available on each policy should the insured die. If the amount of borrowing reflected in the loan balance account was paid by plaintiffs, the cash surrender value of each policy would be appropriately adjusted to reflect this fact and the net death benefits payable would be the face value of the policies ($100,000), or more in the case of the two 1960 policies to reflect Plan B Term Insurance coverage.[6] The following schedule reflects the status of the loan balance account, the net cash surrender value and the net death benefits payable at times material herein on the four policies in issue:

| | Loan Balance Account | Net Cash Surrender Value [7] | Net Death Benefit |
|---|---|---|---|
| Policy No. 14–865–650 | | | |
| January 24, 1967 | $22,083.23 | $1,379.41 | $ 77,916.77 |
| January 29, 1968 | 24,111.53 | 1,347.05 | 75,888.47 |
| Policy No. 59–202–296 | | | |
| January 24, 1967 | 17,454.65 | 1,064.78 | 82,545.35 |
| January 29, 1968 | 19,865.64 | 1,052.04 | 80,134.36 |

| | Loan Balance Account | Net Cash Surrender Value [7] | Net Death Benefit |
|---|---|---|---|
| Policy No. 60–329–912 | | | |
| June 2, 1967 | 15,716.28 | 993.18 | 100,783.72 |
| May 24, 1968 | 18,032.49 | 1,081.93 | 100,867.51 |
| Policy No. 60–329–913 | | | |
| June 2, 1967 | 15,716.28 | 993.18 | 100,783.72 |
| May 24, 1968 | 18,032.49 | 1,081.93 | 100,867.51[8] |

## II

Plaintiffs rest their claim for deductions of the interest payments made to Equitable in 1967 and 1968 on section 163(a) of the 1954 Code. That section provides:

(a) General Rule.

There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.

The section speaks in broad language. It has been noted that the above provision does not contain any general requirement that interest payments, to be deductible, be ordinary, necessary, reasonable, or for a business purpose. In this regard, the deduction for interest differs from some other deductions allowed by the Internal Revenue Code. 4A Mertens, Law of Federal Income Taxation § 26.01 (1972).

There is no statutory [9] nor regulatory authority, and none is cited by defendant, that

amounts of interest paid and the amounts of interest claimed as deductions by plaintiffs.

6. It is noted that in 1960, H. Coors made cash payments of $998.46 (1955 policy) and $560.56 (1959 policy) to Equitable in order to reduce the loan indebtedness secured by said policies. These repayments suggest an economic reality to the loan transactions between H. Coors and Equitable at their inception since the repayments occurred long before the loan arrangement became a matter of controversy. *Compare Pierce v. Commissioner of Internal Revenue,* 311 F.2d 894, 896 (9th Cir. 1962).

7. While the evidence is conflicting and confusing on the matter, the record preponderates in favor of a finding that the net cash surrender values set forth in this schedule do not include any prepaid premium amounts.

8. It should be noted that as to the last two policies, the net death benefits exceed the face amount of the policies ($100,000) because plaintiffs availed themselves of the Plan B Term Insurance option mentioned previously.

9. It is conceded that the provisions of 26 U.S.C. § 264 (1970), relating to the deductibility of amounts paid or accrued on indebtedness incurred or continued to purchase or carry a life insurance contract do not apply to the circumstances of this litigation. Section 264(a)(3) does speak to a situation like that presented by this case but the provisions thereof apply only to life insurance contracts purchased after August 6, 1963. All of the policies in issue were purchased prior to that date. See in this regard *Woodson-Tenent Laboratories, Inc. v. United States,* 454 F.2d 637, 638 n.2 (6th Cir. 1972); *Golsen v. Commissioner of Internal Revenue,* 445 F.2d 985, 990 (10th Cir. 1971).

prohibits the interest deductions claimed by plaintiffs. Defendant does argue, *inter alia,* that the interest payments in question were, on its analysis, utilized to purchase, theoretically, 1-year renewable term insurance and thus were not interest payments in substance but merely payments made to purchase insurance protection. Viewed in this light, defendant maintains that the payments should be considered "personal" and "family" expenses and thus not deductible under 26 U.S.C. § 262 (1970). However, the record in this case will not support any such analytical and theoretical presentation. The interest payments made by H. Coors to Equitable had nothing to do with the costs of said policies, and, in fact, were not utilized in the payment of the premiums on said policies. The effort by defendant to convert the Adjustable Whole Life Policies into renewable 1-year term insurance policies is an unpersuasive exercise of theoretical mathematical argument which is devoid of meaningful factual substance. This matter will receive further discussion at a later point in this opinion.

The key words in section 163(a), *supra,* are "interest" and "indebtedness." In the absence of legislative definitions of these words, the courts have been required to address themselves to the meaning and intendment thereof in varying factual circumstances.

In *Old Colony R.R. Co. v. Commissioner of Internal Revenue,* 284 U.S. 552, 560–61, 52 S.Ct. 211, 214, 76 L.Ed. 484 (1932), the Supreme Court discussed the word "interest" in the following manner:

> * * * And as respects "interest," the usual import of the term is the amount which one has contracted to pay for the use of borrowed money * * *.

> *  *  *  *  *  *

> In short, we think that, in the common understanding, "interest" means what is usually called interest by those who pay and those who receive the amount so denominated in bond and coupon, and that the words of the statute permit the deduction of that sum, and do not refer to some esoteric concept derived from subtle and theoretic analysis.

In *Deputy v. duPont,* 308 U.S. 488, 498, 60 S.Ct. 363, 368, 84 L.Ed. 416 (1940), the Supreme Court, relying on the *Old Colony R. R. Co.* language, cited above, stated: "In the business world 'interest on indebtedness' means compensation for the use or forebearance of money. In the absence of clear evidence to the contrary, we assume that Congress has used these words in that sense * * *." Without more, it would not be unreasonable to consider the payments made by H. Coors to Equitable on the loans obtained from Equitable as interest payments.

However, while in form the payments may serve to compensate for the use of money, the transaction as a whole may be such as to negate any true indebtedness within the intendment of section 163(a). If a transaction underscoring interest payments is considered to be a sham, for example, said payments are not allowed as interest deductions *Knetsch v. United States,* 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960).[10]

The allowability of interest deductions in connection with loan transactions has been the subject of considerable litigation.[11]

---

10. One court, suggesting that it was not necessary to always first label a loan transaction a "sham" in order to deny a deduction for interest in connection with the loan, believed that an interest deduction was allowable where the loan transaction manifested a purposive activity or where there was some substance to the loan transaction beyond the taxpayer's desire to secure the interest deduction. *Goldstein v. Commissioner of Internal Revenue,* 364 F.2d 734, 738, 740–42 (2d Cir. 1966), *cert. denied,* 385 U.S. 1005, 87 S.Ct. 708, 17 L.Ed.2d 543 (1967). This seems to me to be a reasonable way in which to approach the question of the allowability of interest deductions in loan transaction situations.

11. See 4A Mertens, Law of Federal Income Taxation § 26.13a (1972), for a short history of legislation dealing with the allowability of interest on insurance loan transactions. As indicated previously, there is no legislative prohibition against the allowability of the interest deductions claimed herein. What must be determined in this case is whether there is a judicial-

Both parties have cited in their briefs a number of cases which have dealt with the problem. Understandably, plaintiffs rely on cases in which the interest deductions on loan transactions have been allowed whereas defendant relies on cases in which interest deductions on loan transactions have not been allowed. On analysis of these cases it is apparent that the facts in each case were determinative of the result reached although in some instances similar factual situations gave rise to different results in different courts.[12] This much is true, no case has been cited by either party which involves a factual situation identical to the one presently under consideration. Analysis of past decisions in this area only confirms the fact that the allowability of interest deductions on loan transactions involving insurance contracts issued prior to August 6, 1963, varies in accordance with the different factual circumstances presented.

A general theme permeating the decisions relied on by the parties is that an interest deduction on a loan transaction will not be allowed where there was nothing of substance or economic benefit to be gained from the transaction other than an intended tax deduction. *See, e. g., Knetsch v. United States, supra,* 364 U.S. at 366, 81 S.Ct. 132; *Campbell v. Cen-Tex, Inc.,* 377 F.2d 688, 692 (5th Cir. 1967). In this case, it is concluded that there was substance and economic benefit associated with the loan transactions other than the generation of tax deductions.

■ The payment of the premiums due on the four policies in question gave H. Coors, as owner of the policies, life insurance protection on the life of J. Coors, her husband, to the extent that the face amount of the policies exceeded the loans outstanding relative to each policy.[13] This protection, substantial and of economic significance to H. Coors and her children,

would continue as long as the policy premiums were paid when due. Thus, the payment of the premiums due on each policy inured to the benefit of plaintiffs, as did the policy loans obtained to pay part of those premiums. If plaintiffs wanted to continue this protection, it was necessary for them to obtain loans from Equitable to pay the balance of the premiums due and to pay the interest on said loans.

In *Kay v. Commissioner,* 44 T.C. 660, 672 (1965), the Tax Court made the following cogent statement which is applicable to the instant case:

\* \* \* \* \* \*

The obligation on insurance policy loans is unique in that the insurance company looks to the cash surrender value of the policy to pay the loan and interest and no true personal liability arises against the borrower. However, we recognized in *J. Simpson Dean,* 35 T.C. 1083, that by making the loans the owner of the policy becomes obligated in a sense to pay interest thereon, and that such obligation is sufficient to qualify it as deductible interest for income tax purposes because such interest is in fact and in law a charge against his rights in the policies. \* \* \*

*Accord, Salley v. Commissioner of Internal Revenue,* 55 T.C. 896, 903, *aff'd,* 464 F.2d 479 (5th Cir. 1972). *But see, Carpenter v. Commissioner of Internal Revenue,* 322 F.2d 733, 735–36 (3d Cir. 1963), and *Golsen v. Commissioner of Internal Revenue,* 445 F.2d 985 (10th Cir. 1971).

The loan transactions between Equitable and H. Coors were simple and straightforward. The form of each loan transaction reasonably reflected its substance. Each loan was the subject of a loan application contract between H. Coors and Equitable. These loan transactions were standardized

---

ly imposed prohibition against the allowability of the claimed interest deductions.

12. *Compare Campbell v. Cen-Tex, Inc.,* 377 F.2d 688 (5th Cir. 1967) (relied on by plaintiff) and *Goldman v. United States,* 403 F.2d 776 (10th Cir. 1968) (relied on by defendant). See

in this regard *Woodson-Tenent Laboratories, Inc. v. United States, supra,* 454 F.2d at 638–39.

13. Each policy in issue would have paid over $75,000 if J. Coors had died in either 1967 or 1968. See the schedule on page 13, *supra.*

as to form and procedure and were available to all Equitable policy owners. Indeed, under the laws of the State of New York, to which Equitable was subject, Equitable could not refuse to make loans to policy owners on the security of their policies. There is no basis, on this record, for viewing the loan transactions between H. Coors and Equitable as contrived, ingenious or complex.

It is true that each successive loan agreement served to reduce the cash surrender value of each policy. However, it also served to reduce the net death benefits payable under each policy to the extent of said loans. Thus plaintiffs' beneficial interests were affected by the loan transactions. These facts do not render the loan transactions "shams" or "without economic substance." [14] Moreover, as of 1967 and 1968, the net death benefits payable were considerably greater than the existing loans. *See Priester Machinery Co. v. United States,* 296 F.Supp. 604, 608 (W.D.Tenn.1969). That the death benefits might become negligible if the present pattern of borrowing by H. Coors continued over a period of years is irrelevant under the circumstances. The immediate and substantial protection afforded by the policies in 1967 and 1968 was genuine and of economic substance. Plaintiffs might reasonably be most concerned about providing, to the extent financially possible, maximum insurance coverage during the years of their children's greatest dependence. They might otherwise provide for the family's financial security as family circumstances changed in

the future. In any event, the use of borrowed funds to maintain life insurance coverage on the life of the family provider, J. Coors, has a significance far greater than the creation of tax deductions on the record in this case. The loan transactions in issue cannot be said to be illusory or purposeless.

It is also true that because of the opportunity to borrow on her policies, H. Coors' actual cash expenditure toward payment of her premiums on each policy was small in comparison to the amount of insurance coverage obtained.[15] Defendant considers this relatively small annual out-of-pocket cash expenditures made by H. Coors as a manifestation that the loan transaction lacked significant economic substance. Defendant, however, ignores the fact that with each loan, the net death benefits payable were reduced. It was the protection of the family in case of J. Coors' death that was the primary concern of plaintiffs. Borrowing on the policies was serving to reduce this protection. However, borrowing was necessary in order to meet the premium payments due without which there would be no financial security coverage. Thus, the cash payments, small as one might view them to be, were not trivial when the totality of the circumstances is taken into account.

Each of the cases primarily relied on by defendant in support of its contention that the payments in issue should be disallowed as interest deductions differs in significant respects from the case here under consideration.

14. Defendant stresses the fact that the net cash surrender value of each policy was not significant in 1967 and 1968 because H. Coors systematically borrowed on the security of said policies from 1961 and thereafter. Defendant, however, ignores the concomitant decrease in the net death benefits payable, a viable economic consideration. While defendant is wont to dwell on the investment feature of the policies, *i. e.,* the cash surrender value build-up potential, it ignores the fact that plaintiffs were concerned about the protection feature of the policies when they purchased them and at all times while keeping the policies alive. There is no evidence in the record that plaintiffs purchased these policies for investment purposes. On the death of the insured, it is the net death

benefits that are paid. The cash surrender value of each policy ceases to exist as an economic reality when death occurs whether such value is zero or $25,000.

15. H. Coors made cash payments of $3,683 to Equitable in 1967, at which time the insurance protection provided by the four policies was around $360,001. In 1968, H. Coors made cash payments of $3,490 to Equitable at which time the insurance protection provided by the four policies was around $356,001. Dividends received by H. Coors in 1967 of $2,434, and in 1968 of $2,670 were applied, in whole or in part, toward premium payments.

In *Knetsch v. United States, supra,* Knetsch, a 60-year old taxpayer, purchased ten 30-year maturity single premium deferred annuity savings bonds from an insurance company for a price of $4,004,000. Knetsch entered into loan arrangements with the insurance company relative to the purchase of these bonds whereby, *inter alia,* he prepaid the interest due on said loans and also was allowed to borrow in excess of the cash and loan value provisions of the bonds. During the taxable years involved, Knetsch paid the insurance company $294,570 and received $203,000 back in the form of loans. Thus Knetsch's out-of-pocket expense was $91,570. Knetsch's loan arrangements were such that his borrowings kept the net cash value, on which any annuity payment (on maturity) or insurance payment (on death) would depend, at the "relative pittance of $1,000." The loan transactions which commenced in 1953 were terminated in 1956. At that time, the cash or loan value of the bonds was $1,000 greater than Knetsch's indebtedness to the insurance company. When Knetsch surrendered his bonds in 1956, his indebtedness to the insurance company was cancelled and he received the $1,000 in cash. In denying claimed interest deductions, the Supreme Court stated:

\*  \*  \*  \*  \*  \*

\*  \*  \* For it is patent that there was nothing of substance to be realized by Knetsch from this transaction beyond a tax deduction. What he was ostensibly "lent" back was in reality only the rebate of a substantial part of the so-called 'interest' payments. The $91,570 difference retained by the company was its fee for providing the facade of "loans" whereby the petitioners sought to reduce their 1953 and 1954 taxes in the total sum of $233,297.68. There may well be single premium annuity arrangements with nontax substance which create an 'indebtedness' for the purposes of § 23(b) of the 1939 Code and § 163(a) of the 1954 Code. But this one is a sham. \*  \*  \* [364 U.S. at 366, 81 S.Ct. at 135.]

In this case, there was no "facade" of loans orchestrated for a single individual. The loan transactions between H. Coors and Equitable were straightforward, ordinary and available to any policy owner of Equitable. Moreover, the loan transactions here were not short termed and the interest on the loans were never prepaid. The cash payments H. Coors made to Equitable in 1967 and 1968 exceeded, even though minimally, the interest deductions claimed for those years, contrasting sharply with the significant spread in the *Knetsch* case between the cash paid and the excessively larger interest deductions claimed. Finally, in 1967 and 1968, the net death benefits payable on each of the four policies was in excess of $75,000, and totaled some $360,001 in 1967 and some $356,001 in 1968. These amounts can hardly be considered a "relative pittance." Since plaintiffs received insurance coverage of this magnitude during the years in issue, it is hard to accept defendant's repeated assertion that plaintiffs during those years received nothing of substance from the various policy advances or loans except a purported interest deduction. There is no basis for viewing plaintiffs' loan transactions with Equitable as "shams."

In *Ballagh v. United States,* 331 F.2d 874, 166 Ct.Cl. 191, *cert. denied,* 379 U.S. 887, 85 S.Ct. 157, 13 L.Ed.2d 92 (1964), this court was confronted with a *Knetsch* type situation wherein *Ballagh,* the taxpayer purchased an annuity contract from a life insurance company and at the time of purchase paid the first year's annual premium of $10,000 (the contract provided for 41 annual $10,000 premium payments). On the same day, Ballagh borrowed an amount from a bank sufficient to prepay the 40 remaining annual premium payments, giving due consideration to the compound discount of 2.856 allowed by the insurance company when premiums were prepaid. Thereafter, Ballagh, the bank and the insurance company entered into a series of transactions, the bottom line of which showed Ballagh with a net profit of some $15,000 on the loan transaction which generated the 1953 and 1954 interest payments in question. The loan arrangement which

underscored the borrowing and interest payments in *Ballagh* commenced in December 1947 and was cancelled, at Ballagh's request, in December 1956, and the policy converted to paid-up insurance. Relying on *Knetsch*, this court found the loan arrangement to be a sham. The court stated in pertinent part:

> * * * For the transaction which we find to be a sham is not the initial insurance contract but the prepayment of all of the premiums and the loan agreement. We do not question that plaintiff's motive in buying the policy was a legitimate one. However, the subsequent prepayment of all premiums by borrowing from the insurance company itself was not necessary in so providing retirement income, and we find that such loan transaction did "not appreciably affect his beneficial interest except reduce his tax." * * * [331 F.2d at 878, 166 Ct.Cl. at 198.]

As indicated previously, there is no reasonable basis to consider the loan transactions in issue "shams." More importantly, as far as the *Ballagh* decision is concerned, is the fact that the premiums on the policies in question were never prepaid or discounted in any manner. H. Coors borrowed only to meet current premium payments due on the policies.

*Golsen v. Commissioner of Internal Revenue, supra,* involved special life insurance policies which at their inception contemplated loan transactions which embodied, *inter alia,* prepayment and discount of premiums and prepayment of interest. Indeed, the court referred to these transactions as "the super-structure of 'loans'." In addition, the annual premium payments were set at an artificially high level so as to create an abnormally high cash value immediately in order to facilitate the contemplated lending transaction. These arrangements allowed for borrowing from the insurance company

the entire amount of the first year's cash values of the policies, which loans were simultaneously used to pay the greater part of the first year's premiums on said policies. This contrived arrangement led the court to declare the loan transactions a sham and without economic significance and substance. The loan transactions here in issue were not specially tailored for an individual; they were not contrived; the premiums were not manipulated to facilitate borrowing on the policies; the premiums were never prepaid or discounted, nor was the interest ever prepaid. The *Golsen* facts are not present in this case. There are language and analysis in the *Golsen* decision which have surface application to the situation in this case. The *Golsen* decision stressed the fact of "systematic borrowing," and the fact the policies had no cash surrender value because of the borrowings. Further, the *Golsen* decision relied on an analysis which led the court to view the policies as renewable term insurance policies and thus enabled the court, utilizing hypothetical average term insurance premium rates, to conclude that the interest deductions claimed were equivalent to renewable term insurance rates and thus represented actuarially the sums necessary to support insurance benefits available under policies which had no cash surrender value. This analysis led the court in *Golsen* to find that since the interest deductions claimed in fact represented the cost to the taxpayer of the insurance benefits provided, no interest deduction was allowable. Defendant stresses these aspects of *Golsen* in urging this court to reject the interest deductions claimed by plaintiffs. However, my reading of *Golsen* indicates that the sham nature of the loan transactions at the inception was the crucial factor underscoring that decision and the court's language and analysis must be read in that light.[16] In any event, the *Golsen*

---

**16.** In *Golsen*, the court noted it needed expert actuarial assistance in its consideration of the matter before it. It relied on the testimony of such an expert who analyzed the matter, utilizing the renewable term insurance approach, and showed to the court's satisfaction that the loan arrangement had no essential relationship

to the insurance benefits provided. In this case, defendant produced a senior actuarial employee of the Internal Revenue Service who failed to persuade that the loan transactions in issue were without any substance or bore no relationship to the insurance benefits provided. As in *Golsen*, defendant's analysis in this case

holding has not been universally adopted as acceptable precedent. *See Woodson-Tenent Laboratories, Inc. v. United States*, 6 Cir., 454 F.2d 637, 638–39; *see also Campbell v. Cen-Tex, Inc., supra; cf. Goldman v. United States*, 403 F.2d 776 (10th Cir. 1968).

Analysis of the other cases cited by defendant also shows marked and significant factual differences from the case at bar which thereby serve to eliminate their precedential value. For example, in *Goldman v. United States, supra*, the denial of interest deductions on life insurance policy loans was mandated by a finding that the loan transaction was without economic substance. The offensive feature of the loan transaction in *Goldman* was the prepayment and discounting of premiums. Further, it was observed that while the interest on the loans was 4 percent, the annual increase in policy value was at the rate of 3 percent, an annual loss of 1 percent. The court in *Goldman* noted that the annual loss of 1 percent indicated a lack of economic substance to the loan transactions since the record in the case revealed that the taxpayer was not pressed for cash. As indicated previously, the premium payments in this case were never prepaid or discounted. Further, the record here suggests a cash liquidity problem relative to the continued borrowing by H. Coors. As observed previously, the allowability of interest deductions on insurance policy loans has been litigated in a wide variety of factual settings. One can find in the litigated decisions which have denied interest deductions some features of the loan transactions between H. Coors and Equitable. Conversely, one can also find those same features in decisions which have upheld the interest deductions. As noted in *Rothschild v. United States*, 407 F.2d 404, 408, 186 Ct.Cl. 709, 717 (1969), the cases dealing with interest deductions generated by loan transactions lack uniformity, are seemingly conflicting

and are productive of confusion. The common denominator to be found in those cases denying the interest deduction is the conclusion that the loan transaction could not appreciably affect the taxpayer's beneficial interest except to reduce the taxpayer's federal income tax.

■ Recognizing this common denominator, defendant made a concerted effort to show that although the policies in question were, in name, provisions and administration, Adjustable Whole Life policies, they functioned, on its analysis, like renewable 1-year term insurance policies. Viewing the policies as guaranteed renewable 1-year term insurance policies, defendant utilized an average hypothetical 1-year renewable term insurance premium rate,[17] and, giving consideration to the insurance coverage provided by the four policies in issue in 1967 and 1968, computed the 1-year term insurance cost for said policies. Since this cost figure was somewhat equivalent to the interest deductions claimed by plaintiffs in 1967 and 1968, defendant concludes the interest deductions claimed were actually payments for insurance protection during those years.

I have carefully considered the testimony of the government's expert witness who prepared the detailed schedules which provided the foundation for defendant's argument that the policies in question should be treated as guaranteed renewable 1-year term insurance policies. On the record of this case, I am not persuaded that this analysis presents a sufficiently realistic basis, actuarial or otherwise, for impugning the loan transactions in question.

Furthermore, defendant's guaranteed renewable 1-year term insurance approach is in substance a hypothetical analysis. The record indicates J. Coors, in all probability, would not be able to obtain term insurance coverage in 1967 or 1968. Further, if the

---

rested on the premise the policies in issue were in substance renewable 1-year term insurance policies.

**17.** In this endeavor, defendant relied on an Internal Revenue Service published schedule

(PS–58) of average term insurance rates utilized by the Service in evaluating employee pension plans, etc. The guaranteed renewable 1-year term insurance rate that Equitable generally charged was not in the record.

policies are viewed as term insurance policies, it is doubtful if any loans could be obtained on the security thereof from Equitable since term insurance policies generally do not have any reserve values (see the "Loans" provision clause of the policies, cited p. 829, *supra*). It is recognized that term insurance is significantly different than whole life insurance. Term insurance insures against a contingency (death during the term), while whole life insurance insures against a certainty (death). One cannot hypothesize about term insurance because the provisions of any such policy determine whether renewability will be guaranteed, whether a physical examination will be required, etc. *See generally* Huebner S. S. and Black K., *Life Insurance* at p. 75 (8th ed. 1972). These are realistic observations and they serve to discredit the hypothetical analysis advanced by defendant. As the Supreme Court observed in *Old Colony R.R. Co. v. Commissioner of Internal Revenue, supra,* the denial of an interest deduction should not be based on "some esoteric concept derived from subtle and theoretic analysis." (284 U.S. at 561, 52 S.Ct. at 214).[18]

Finally, defendant has advanced this renewable 1-year term insurance analysis approach in opposing interest deductions on policy loans in several other cases. In rejecting this analysis in *Campbell v. Cen-Tex, Inc., supra,* the Fifth Circuit observed:

> Perhaps the Government has a broader definition of term insurance than is generally used. A term policy of life insurance is one which is issued for a limited and specified period with benefits payable only if death occurs within the period. Term policies do not, generally, have reserve values.

*Accord, Priester Machinery Co. v. United States, supra,* 296 F.Supp. at 609–10. As indicated earlier, however, the expert witness in *Golsen v. Commissioner of Internal Revenue, supra,* satisfied the Tenth Circuit that this type of analysis had meaningful implications under the circumstances of that case. I am not persuaded in this case that the analysis proffered by defendant whereby it treats these policies, which in all material respects are Adjustable Whole Life policies, as 1-year guaranteed renewable policies, is meaningful enough to justify denial of the interest deductions claimed.

The one unvarnished factor in this case on which defendant's opposition to the claimed interest deductions can objectively rest is this: the systematic borrowing by H. Coors on the security of the four policies in order to assist her in the payment of the annual premiums due thereon was such that in 1967 and 1968, the tax years in issue, there was no significant build-up of the loan and cash surrender values of said policies. However, defendant has cited no case where, on this factor alone, an interest deduction based on policy loans has been disallowed. Further, the insurance policies issued to H. Coors were standard policies, available to the public at large, and the loan transactions were straightforward and simple. The death benefits payable, if J. Coors had died in 1967 or 1968, were substantial and greatly exceeded the maximum indebtedness then outstanding. The borrowing by H. Coors was purposive and reasonable under the circumstances of this case.

In all the cited cases where an interest deduction on policy loans has been denied, other significant factors have served to contaminate the loan transaction and resulting claimed interest deduction. These factors, missing in the instant case, are prepayment and/or discounting of premium payments, setting premium payments at an artificially high level in order to facilitate immediate

---

**18.** The tenuous nature of defendant's litigating analysis position is to be found in defendant's response to the question of what would have happened if the taxpayer repaid all the loans thereby maximizing the loan and cash surrender values of each policy. Defendant advised that it would then characterize the policies as guaranteed renewable 1-year term insurance policies with a retro-conversion feature, *i. e.*, by repaying the loans, the policies would be once again Adjustable Whole Life policies. Defendant cites no policy provisions which provide for any such changes in the character of each policy, nor is the record in this case enlightening relative to defendant's blithe use of retro-conversion as a concept to prevent the total collapse of its hypothetical analysis.

and significant borrowing, prepayment of interest, and contrived, ingenious, and complex loan arrangements whose only ultimate and/or realistic purpose was to secure intended tax deduction benefits. In *Goldman v. United States, supra*, 403 F.2d at 778, the Tenth Circuit observed that the principles utilized by the courts in restricting the deductibility of interest in various circumstances were generally of the " 'smell-test' variety." I am unable to detect in the loan transactions between H. Coors and Equitable an "odor piscatorial." *See Alinco Life Ins. Co. v. United States*, 373 F.2d 336, 341, 178 Ct.Cl. 813, 823 (1967).

## CONCLUSION OF LAW

Upon the opinion and the findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are entitled to recover, including appropriate interest as provided by law, and judgment is entered to that effect, with the determination of the exact amount of recovery to be made in further proceedings under Rule 131(c).